IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL NUMBER: |
| v. | : | 1:13-CR-419-CAP-JSA |
| | : | |
| ANTHONY WRIGHT | : | |
| | : | |
| Defendant | : | |

## **REPORT AND RECOMMENDATION**

On March 7, 2013, the Georgia State Patrol stopped Defendant's car after observing it cross a double yellow line near a sharp curve with a limited sight distance. Based on other information obtained during the traffic stop, Defendant was charged in this Indictment [1] with being a felon in possession of a firearm, in violation of Title 18 U.S.C. §§ 922(g)(1), 924(a)(2) and 924(e). Now before the Court is Defendant's Motion to Suppress Evidence [10] and Motion to Suppress Statements [11], in which Defendant makes a single argument: that the Georgia State Patrol lacked probable cause or reasonable suspicion of a traffic violation to justify the stop of the car, and that all evidence obtained as a result should be suppressed.

The Court held an evidentiary hearing on February 7, 2014. After a brief continuance, Defendant filed his post-hearing memorandum on March 28, 2014, and the Government filed its response on April 11, 2014. Defendant was permitted

to file a reply brief by April 18, 2014 but did not do so.

For the reasons set out below, the undersigned finds that the traffic stop was justifiable under either a probable cause or reasonable suspicion standard.  Thus, the undersigned **RECOMMENDS** that the Defendant's Motion to Suppress Evidence [10] and Motion to Suppress Statements [11] be **DENIED**.

## FACTUAL BACKGROUND

On March 7, 2013, Georgia State Patrol Trooper Ron Calvert was conducting routine patrol in a marked vehicle. Transcript of Hearing, February 24, 2014 [14] ("Tr".) at 7. Trooper Calvert left the Georgia State Patrol Headquarters on East Confederate Avenue when he noticed a school bus at an apartment complex with its yellow warning lights on, pulling away from the curb. *Id*. The audio and visual recording of this traffic stop from Trooper Calvert's patrol car was entered into evidence at the hearing. Ex. 4 (DVD recording). [1] About the same time, a small passenger car turned from a side street, accelerated rapidly, went around the school bus and, in doing so, crossed a double yellow line in the roadway. Tr. at 7-9, 37-38 and Ex. 4 at :46-:50. Trooper Calvert was concerned because the small passenger car crossed the yellow line near a sharp curve with limited visibility to oncoming traffic. *Id*. Trooper Calvert accelerated his speed,

---

[1] References to certain segments of the recording will rely on the clock timer that appears in the video player. (E.g., "1:00-1:15")

activated his lights, passed the school bus and initiated a traffic stop. Tr. at 9, Ex. 4, :50-1:15.

After the car came to a stop, Trooper Calvert approached the driver's side of the car and asked the driver, later identified as Defendant Anthony Wright, for his license. Tr. at 9-10, Ex. 4, 1:21-1:57. Trooper Calvert asked Mr. Wright to step out of the car and move to the back of the car so that they could speak without being interrupted by the passenger. Tr. at 9-10, Ex. 4, 2:05. Mr. Wright provided Trooper Calvert a Florida driver's license in the name of Anthony Davis. Tr. at 10, Ex. 4, 1:40-2:00. Trooper Calvert ran the license in his computer system located in his patrol car. Tr. at 10-11, Ex. 4, 3:09-7:17. The results indicated that Mr. Davis should be six-foot-three, whereas the driver's license provided to Trooper Calvert listed a height of five-foot-ten. Tr. at 11. The discrepancy caused a concern and Trooper Calvert requested another unit. *Id.*

Trooper Calvert went back to Mr. Wright and further questioned him about former addresses and his social security number. Tr. at 11-12, Ex. 4, 7:17-9:10. Mr. Wright produced a piece of paper that had a written social security number on it and gave it to Trooper Calvert. Tr. at 12, Ex. 4, 8:12-8:18. The social security number provided by Mr. Wright did not match the information provided from the State of Georgia. *Id.* Trooper Calvert found it unusual that a grown adult would not know their social security number or a former address. Tr. at 12-13. Trooper

Calvert asked Mr. Wright if he had any weapons and proceeded to conduct a pat down of the pockets of Mr. Wright's jacket, as well as his waistband, and the tops of his pants. Tr. at 13, Ex. 4, 9:00-9:10. Nothing was discovered from conducting the pat down. *Id.* Trooper Calvert requested a fingerprint scanner be brought to the location of the traffic stop because he was having some difficulties identifying that the driver was the same person who was listed on the driver's license. Tr. at 13-14, Ex. 4, 13:48-13:50.

While waiting for the fingerprint scanner to arrive, Trooper Calvert continued conversation about the issues he was having regarding the discrepancies, but Mr. Wright insisted that he was who he said he was on the driver's license. Tr. at 15, Ex. 4, 14:00-16:45, 19:25-24:30. During this time, Mr. Wright was not handcuffed and he was walking around the back of, or leaning on, his car and uses his phone. Tr. at 15, Ex. 4, 7:17-25:30. Mr. Wright asked to speak to Trooper Calvert alone so Mr. Wright and Trooper Calvert stepped about five feet away from the other troopers. Tr. at 16, Ex. 4, 25:25-25:30. Wright told Trooper Calvert he had a gun. *Id.*, Ex. 4, 25:30-26:00. At that time, before removing the gun, Trooper Calvert placed Mr. Wright into handcuffs in fear of a threat and to safely remove the gun. Tr. at 16. The gun was removed from Mr. Wright's pocket. Tr. at 17, Ex., 4, 26:00-26:30. When Trooper Calvert handcuffed Mr. Wright he smelled a strong odor of marijuana, but Mr. Wright stated that he did not have any

marijuana on him. Tr. at 17, Ex. 25:25-28:30.

Trooper Doug Allen arrived with the fingerprint scanner. Tr. at 17, Ex. 4, 30:30-31:00. A scan of Mr. Wright's finger showed that he was Anthony Wright, who was on parole or probation for manslaughter, his license was suspended, and had an active arrest warrant for a probation violation out of Dekalb County. Tr. at 17, 25, Ex. 4, 31:30-33:30. Mr. Wright was arrested and placed in Trooper Calvert's patrol car. Tr. at 20, Ex. 4, 36:30-40:00. Before leaving the location of the traffic stop, along with the gun, Mr. Wright admitted to having drugs in his possession. Tr. at 18-20. The drugs, later identified as "Molly", and the gun, a Sig Sauer P-938, were taken into evidence. *Id*.

Trooper Calvert transported Mr. Wright to jail. Tr. at 20. A mile down the road, Trooper Calvert read Mr. Wright his *Miranda* warnings and Mr. Wright stated that he understood his rights. *Tr*. at 20-22, Ex. 4, 47:00-47:40  Mr. Wright continued to talk after the Miranda warnings were read to him stating that he had gotten the gun from his girlfriend and that the drugs were "Molly". Tr. at 22-23, Ex. 4, 47:40-59:00.

## ANALYSIS

### I.   The Traffic Stop Was Lawful

In order to at least briefly stop a vehicle, an officer must have reasonable and articulable suspicion that the occupants are engaged in criminal activity. *Terry v. Ohio*, 392 U.S. 1 (1968); *United States v. Sharpe*, 470 U. S. 675 (1985).  To make a showing that in fact the officers had reasonable suspicion, they "must be able to articulate more than an 'inchoate and unparticularized suspicion or 'hunch' of criminal activity.'" *Illinois v. Wardlow*, 528 U.S. 119, 123-4 (2000) (quoting *Terry*, 392 U.S. at 27).

Probable cause is not required to justify an investigative stop; reasonable suspicion is sufficient.  *United States v. Powell*, 222 F.3d 913, 917-8 (11th Cir. 2000); *United States v. Mikell*, 102 F.3d 470, 474-5 (11th Cir. 1996).  However, if the scope of a traffic stop exceeds that of an investigative stop of limited duration, it constitutes an unreasonable seizure unless it is supported by probable cause.  *See United States v. House*, 684 F.3d 1173, 1199 (11th 2012).  Probable cause requires more than a mere suspicion, but does not require the same "standard of conclusiveness and probability as the facts necessary to support a conviction." *United States v. Dunn*, 345 F.3d 1285, 1290 (11th Cir. 2003) (*quoting Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir. 2002)).

The evidence supports the legality of the traffic stop here under either a

reasonable suspicion or probable cause standard.  Trooper Calvert testified that he saw Defendant's car accelerate rapidly and pass a school bus by crossing a solid double yellow line in the roadway.  This incident was captured on Trooper Calvert's video recording system.  The Court has reviewed a copy of the video recording and finds that it corroborates the Trooper's testimony.

This conduct violated Georgia Code Section § 40-6-46.  Subsection (a) provides that a solid double yellow line signifies a "no-passing zone," and subsection (b) provides that a "[w]here signs or markings are in place to define a no-passing zone as set forth in subsection (a) of this Code section, no driver shall at any time drive on the left side of the roadway within such no-passing zone or on the left side of any pavement striping designed to mark such no-passing zone throughout its length."  The officer thus had probable cause, and certainly had reasonable suspicion, to justify stopping the car.

Defendant does not argue that Trooper Calvert lacked probable cause or reasonable suspicion of a no-passing violation.  Rather, Defendant argues solely that he legally passed the school bus, because the bus's stop sign and red flashing lights were not activated at the time of the pass.  Def. Brief [17] at 6-7.  Trooper Calvert agreed at the hearing that one can legally pass a school bus where, as was the case here, only the yellow warning lights are flashing.  *See* Tr. at 35.

Defendant's argument is irrelevant, however.  The Government does not rely

on a violation of school bus passing prohibitions. Regardless of whether any particular care was required because there was a school bus on the road, Defendant was still prohibited from passing in a no-passing zone. This was true, whether he was passing a school bus or any other vehicle. Defendant does not refute, and the evidence at the hearing shows, that Trooper Calvert observed probable cause of the no-passing violation.

Defendant's argument therefore fails. No suppression is warranted as a result of the traffic stop and Defendant's Motion to Suppress Evidence [10] should be **DENIED**.

    2.    **Defendant's Statements Are Not Suppressible**

Defendant filed a Motion to Suppress Statements [11] alleging that his statements were obtained involuntarily and not in compliance with *Miranda v. Arizona*, 384 U.S. 436 (1966). However, Defendant does not include any arguments in support of this motion in his post-hearing brief, indicating that he is abandoning this ground for suppression.

Nevertheless, the Court *sua sponte* finds that the record supports a finding of voluntariness and that Defendant's post-*Miranda* statements and pre-*Miranda* admissions about possessing a gun are not subject to suppression.

In *Miranda*, 384 U.S. at 444, the Supreme Court held that a suspect who is in custody must be advised of his right to remain silent and of his right to the

assistance of counsel prior to any interrogation by law enforcement. The Government has the burden to show the knowing and intelligent nature of a *Miranda* waiver. *Id.* at 475. The Supreme Court instructs courts to look for two things:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal[s] both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived. *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (quotation marks and citation omitted).

In addition to its compliance with *Miranda*, the Government must also show that the Defendant's statements were made voluntarily. Determining whether a statement is voluntary depends on whether, under all of the surrounding circumstances, the statement was the product of the accused's "free and rational" choice. *United States v. Jones*, 32 F.3d 1512, 1516 (1994); *see Arizona v. Fulminate*, 499 U.S. 279, 285–88 (1991). The Eleventh Circuit has stated:

> Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession. Isolated incidents of police deception, and discussions of realistic penalties for cooperative and non-cooperative defendants, are normally insufficient to preclude free choice.

*Jones*, 32 F.3d at 1517 (quotation omitted).

A mere traffic stop does not constitute custody and does not trigger *Miranda*'s protections at least as to questioning within the scope of a reasonable investigation, which includes questioning as to a suspect's identity and possession of weapons.  *See Berkemer*, 468 U.S. at 442.  Thus, Trooper Calvert's questions to Defendant during the traffic stop about those subjects were permissible and Defendant's responses–including his admission that he possessed a gun–are not subject to suppression despite the absence of *Miranda* warnings.  *See United States v. Newsome*, 475 F.3d 1221 (11th Cir. 2007) (officer permissibly asked arrested defendant, before *Miranda* warnings, "is there anything or anyone in the room I should know about," to which defendant disclosed the location of a gun); *United States v. Jackson*, 280 F.3d 403, 405-406 (4th Cir.2002) (finding that an officer was "fully justified" in inquiring about weapons after making a traffic stop); *Cf. Pennsylvania v. Mimms*, 434 U.S. 106, 109-12 (1977) (finding no Fourth Amendment violation where an officer who had made a routine traffic stop asked the driver to exit the vehicle to reduce the danger to himself).[2]

Trooper Calvert testified that he read Defendant his *Miranda* rights while transporting him to jail, and Defendant responded that he understood his rights.  Tr. At 20-22.  Defendant continued making statements after acknowledging he

---

[2] Nor was it improper for the officers during the traffic stop, after smelling marijuana, to ask the Defendant whether he possessed any drugs.  *See United States v. Purcell*, 236 F.3d 1274, 1279-1280 (11th Cir. 2001).

understood his right not to.  Ex. 4 at 47:40-59:00.  The Government cites Trooper Calvert's recording as evidencing the voluntariness of Defendant's statements and the lack of improper coercion or inducements by the officer.  *See id*.  Defendant does not argue otherwise and the Court finds on this record that Defendant's statements were made voluntarily and in compliance with *Miranda*.[3]

---

[3] The recording reveals several minutes of conversation–sometimes argumentative conversation–between the Trooper and the Defendant in the car, after arrest and before formal advisement of *Miranda* rights.  *See* Ex. 4 at (approx.) 40:00- 48:00.  The Court has reviewed this discussion *sua sponte*, because no argument was supplied by either party.  The conversation began with the Defendant argumentatively asking why he was being arrested after having cooperated and volunteered that he had a gun.  The Trooper then proceeded to explain why he was arresting the Defendant and why he considered the Defendant to be a safety risk, including by referencing Defendant's prior record and the Trooper's perception that the Defendant had lied to him.  Defendant responded by arguing that he was not a threat and in the process repeatedly stated that he had volunteered the fact that he had a gun.  The Trooper continued to argue why he was arresting the Defendant, including noting that the Defendant had "killed someone" before.  *Id.*

It would have been better for Trooper Calvert to administer *Miranda* warnings more immediately and not engage in this extended post-arrest and pre–*Miranda* argument.  But none of this was impermissible interrogation.  Informing a suspect of the reasons for arrest–especially in response to the Defendant's own questions about why he was arrested–is "normally attendant to arrest and custody" and is therefore excluded from the definition of "interrogation."  *See Rhode Island v. Innis*, 446 U.S. 291, 301 (1980); *Enoch v. Gramley*, 70 F.3d 1490, 1500 (7th Cir.1995) ("Briefly reciting to a suspect in custody the basis for holding him, without more, cannot be the functional equivalent of interrogation."); *United States v. Payne*, 954 F.2d 199, 202 (4th Cir.1992) ("the *Innis* definition of interrogation is not so broad as to capture within Miranda's reach all declaratory statements made by police officers concerning the nature of the charges against the suspect and the evidence relating to those charges."); *United States v. Crisco*, 725 F.2d 1228, 1232 (9th Cir.1984) (merely

Thus, Defendant's Motion to Suppress Statements [11] should be **DENIED**.

## CONCLUSION

It is **RECOMMENDED** that Defendant's Motion to Suppress Evidence [10] and Motion to Suppress Statements [11] be **DENIED**.

This case is **READY FOR TRIAL**.

**IT IS SO ORDERED** this 28th day of April, 2014.

_____
JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE

---

explaining to a suspect why he is being arrested does not constitute interrogation). Moreover, that Defendant initiated this argument and kept insisting that he was being treated unfairly for having volunteered that he was holding a gun also shows that he was speaking voluntarily.  Thus, the Court finds that these statements are not subject to suppression.